**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Jesse R. SMITH, Defendant-
Appellant.**

No. 73–1182.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 31, 1973.

Decided Nov. 30, 1973.

Arthur J. O'Donnell, Chicago, Ill., for defendant-appellant.

James R. Thompson, U. S. Atty., William T. Huyck, Asst. U. S. Atty., Scott Baskin, Justice Dept. legal intern, Chicago, Ill., for plaintiff-appellee.

Before KILEY, PELL and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

This appeal calls upon us to align this circuit on the question of the nature of the scienter element under 18 U.S.C. § 641, stealing or converting government property. Some circuits hold it to be sufficient for the government to show that it owned the property and that the defendant merely knew that he was stealing or converting someone's property, while other circuits require the government to prove that the defendant knew that the stolen or converted property was owned by the government.

The facts in this case make it an ideal vehicle for deciding the issue. The defendant ran off with $12,000 in government funds handed to him by an undercover agent trying to make a drug purchase. As defendant urged, the agent's "dress, car, everything he did, was to assure that his true identity would not be revealed" as a federal agent using recorded federal funds.

### I

On July 11, 1972, defendant Jesse R. Smith met Juan Juarez (who "was working as a cooperating individual with the Bureau of Narcotics") through a long-time friend of defendant, Michael Watkins, at Watkins' house. According to the defendant, Juan told him that he had a brother-in-law who was a drug distributor and "couldn't get anything"; that Juan suggested that they could sell the brother-in-law mostly milk sugar with a little heroin in it and that Juan, Watkins and defendant could divide the purchase price in some way; that defendant agreed to the arrangement but intended to deliver milk sugar only; and that Juan left Watkins' house but telephoned defendant there later, saying that "they wanted to spend about $9,000."

On July 12, 1972, agent Yarbrough withdrew $12,000 in government funds, recorded the serial numbers and drove to the parking lot of the Prince Castle Restaurant in Chicago Heights, Illinois, where he met Juan and Watkins. The three men walked to another automobile where defendant was sitting, at which time Yarbrough and defendant were introduced to each other. Defendant offered to sell Yarbrough 10 ounces of "the stuff" for $9,000 but Yarbrough asked for 16 ounces for $12,000. Yarbrough testified that in the narcotics trade "stuff" means heroin.

After defendant made several telephone calls, Juan and Watkins remained behind while Yarbrough and defendant drove in Yarbrough's car to 84th and Wabash Streets, Chicago, where they stopped near a green Buick automobile with two occupants whom defendant categorized as "my people." Defendant asked for the $12,000 which Yarbrough gave to him. Defendant then started to walk toward the Buick, which began to drive away with defendant jogging along after it. Yarbrough drove abreast of defendant and said "Come back with the money," whereupon defendant ran across a yard and disappeared between two houses as the Buick sped away. Other government agents in three automobiles who had been surveilling Yarbrough captured defendant and recovered the $12,000.

Defendant was charged in the indictment as follows:

"On or about July 12, 1972, at Chicago . . . [defendant] knowingly and unlawfully did embezzle, steal, purloin and convert to . . . [his] own use property of the United States . . ., to wit: $12,000; [i]n violation of Title 18, United States Code, Section 641."

18 U.S.C. § 641 provides in part that "Whoever embezzles, steals, purloins, or knowingly converts to his use . . . money . . . of the United States . . . [s]hall be fined not more than $10,000 or imprisoned not more than ten years, or both . . . ."

The parties stipulated that the $12,000 taken from the defendant on July 12, 1972 was the property of the United States.

Defendant was convicted upon a jury trial and sentenced to three years' imprisonment. Upon appeal his two principal contentions were that the government failed to prove that he knew that the money belonged to the United States and that the trial court erred in giving the following instructions:

"To convict the defendant, the government must prove beyond a reasonable doubt that the defendant unlawfully took without authority property owned by the United States and with

the specific intent to permanently deprive the government of its use.

\* \* \* \* \* \*

"It is not necessary, ladies and gentlemen, for the government to prove that the defendant knew that the money belonged to the United States."

## II

In contending that the government failed to prove a necessary element that he knew that he was stealing or converting government property, defendant has relied primarily on Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952).

Morissette was hunting deer on what he knew was government property when he encountered heaps of rusting metal simulated-bomb casings which had been cleared away from ground targets where they had been dropped by the Air Force in practice bombings. Believing the casings to be abandoned, he loaded three tons of them on his truck, flattened them with a tractor on a nearby farm, and sold them for $84. Morissette was indicted under 18 U.S.C. § 641. At his trial he testified that he did not intend to steal the casings but only to salvage what he thought was cast-off and abandoned property.

The district court charged the jury in part that Morissette knew he was on government property and "[t]he question on intent is whether or not he intended to take the property. He says he did." He was convicted and sentenced. The Court of Appeals affirmed.

The Supreme Court reversed, holding that "mere omission from § 641 of any mention of intent will not be construed as eliminating that element from the crimes denounced" and finding no grounds "for inferring any affirmative instruction from Congress to eliminate intent from any offense with which this defendant was charged." 342 U.S. at 263, 273, 72 S.Ct. at 250, 255.

It is clear not only from the facts of the case but also from the Court's opinion that the intent element found to be required in § 641 was the criminal intent to steal and not the intent to steal property known to be government property. Morissette's knowledge that he was dealing with governmental property was not at issue; what was involved was whether his intent to take what he believed to be abandoned property was equivalent to an intent to steal. The district court had taken the position that since he intended to take the property, it could be presumed that he intended to steal it. The Supreme Court said at 271, 72 S.Ct. at 254:

". . . [I]t is not apparent how Morissette could have knowingly or intentionally converted property that he did not know could be converted, as would be the case if it was in fact abandoned or if he truly believed it to be abandoned and unwanted property."

The Court concluded at 275–276, 72 S.Ct. at 256:

"Moreover, the conclusion supplied by presumption in this instance was one of intent to steal the casings, and it was based on the mere fact that defendant took them. The court thought the only question was, 'Did he intend to take the property?' That the removal of them was a conscious and intentional act was admitted. But that isolated fact is not an adequate basis on which the jury should find the criminal intent to steal or knowingly convert, that is, *wrongfully* to deprive another of possession of property."

The scienter required by *Morissette* was knowledge or belief as to whether the property was abandoned or not and hence capable of being stolen or converted. In the present case, there is no question in regard to that kind of scienter—defendant here knew that the $12,000 had not been abandoned and was to be the consideration for 16 ounces of heroin.

However one circuit supports defendant's contention squarely and another circuit supports it by analogy. In Findley v. United States, 362 F.2d 921, 922–923 (10th Cir. 1966), without authority other than a preliminary reference to *Morrissette*, the Tenth Circuit held in a § 641 case that "it was incumbent upon the trial judge to advise the jury . . . it was necessary for the government to prove beyond a reasonable doubt that the defendant knew that the property involved belonged to, and was stolen from, the government." *Findley* was cited as binding authority in United States v. Baltrunas, 416 F.2d 401 (10th Cir. 1969).

In Mitchell v. United States, 129 U.S. App.D.C. 292, 394 F.2d 767 (1968), where the offense was stealing property belonging to the District of Columbia under the District Code, the District Circuit held that scienter as to ownership was necessary.[1] The Court took pains to distinguish the District situation from a § 641 case, pointing out that Congress intended to create a greater deterrent to theft of government property than non-government property because of the former's greater vulnerability (park benches and so forth) and that the Congressional intent would be realized only if potential wrongdoers were aware that they were contemplating stealing government property. The Court also acknowledged that "the analogy to *Findley* and section 641 is weak." 394 F.2d at 771, 773–774. Nevertheless, the Court gave some support to defendant's position in the present case by adding at 774:

> "This reasoning [greater deterrence], coupled with the rule of construction for criminal statutes endorsed by the Supreme Court in *Morissette*, provides substantial grounds for holding that knowledge of government ownership is a necessary element . . . ."

On the other side of the question are the Fifth and Ninth Circuits. In United States v. Howey, 427 F.2d 1017 (9th Cir. 1970), the Ninth Circuit in holding that ownership scienter was not an essential element of § 641, said at 1017–1018:

> "We think that *Findley* is wrong, and we decline to follow it.
>
> "*Findley* does not explain how the conclusion was reached that such knowledge is essential, other than to cite Morissette v. United States . . . and Souza v. United States (9th Cir. 1962) 304 F.2d 274, neither of which is authority for the point."

After distinguishing *Morissette* and its own prior case of *Souza*, the Ninth Circuit concluded at 1018:

> "It was not an essential part of the common law larceny-type offense that the thief knew who owned the property he took; it was enough that he knew it did not belong to him. The legislative history provides no support for an assumption that Congress intended in section 641 to add to the common law offenses a new requirement that a thief know who owned the property he was stealing.
>
> "The reason for including the requirement that the property, in fact, belongs to the Government was to state the foundation for federal jurisdiction. A defendant's knowledge of the jurisdictional fact is irrelevant, as we have held in many cases interpreting analogous statutory provisions."

*Howey* was reaffirmed by the Ninth Circuit in Baker v. United States, 429 F.2d 1278 (9th Cir. 1970).

In United States v. Boyd, 446 F.2d 1267, 1274 (5th Cir. 1971), the Fifth Circuit, in holding that "we do not think that 18 U.S.C. § 641 requires that the accused be aware that the stolen property belongs to the United States or to one of its departments or agencies," conclud-

---

1. The Court said that "this element of the crime may be shown either by specific knowledge of District of Columbia ownership or by the establishment of sufficient facts to put a reasonable person on notice of the District ownership." 394 F.2d at 774.

ed that "we think the Ninth Circuit [in *Howey*] has the better of the argument."

We agree with the Fifth and Ninth Circuits. The Supreme Court's lengthy analysis of § 641 and of the pertinent common law in *Morissette* convinces us that the defendant's knowledge of government ownership is wholly irrelevant in a § 641 prosecution. The common law required only that the accused know that the property is stolen property, belonging to someone other than the thief.

In United States v. Schaar, 437 F.2d 886 (7th Cir. 1971), the defendant and some accomplices intended to break into a tavern but in entering through a coal chute they took a wrong turn and wound up in a bank, the deposits of which were insured by the Federal Deposit Insurance Corporation. Defendant appealed his conviction under 18 U.S.C. § 2113(a), stealing property belonging to a federally-insured banking institution. In affirming, we held that "[p]rior knowledge that the building was a bank is not a *sine qua non* to a conviction" any more so "than prior actual knowledge of the bank's insured status." 437 F.2d at 887. In *Schaar* we analyzed *Morissette,* and distinguished *Mitchell* but also held that "if *Mitchell* dictates . . . [a contrary] result we decline to follow it."

### III

Our problem is somewhat complicated by the fact that the Manual on Jury Instructions in Federal Criminal Cases, popularly known as the LaBuy instructions and adopted by the Judicial Conference of the Seventh Circuit in May, 1962, 36 F.R.D. 457, contains four recommended instructions which refer to knowledge of ownership of government property:

Section 19.01—Offense of Stealing Government Property: "[W]ith knowledge that the property belonged to the United States" (36 F.R.D. at 634).

Section 19.02—Offense of Unauthorized Sale of Government Property: "[W]ith knowledge that the property

was owned by and was stolen from the United States" (634).

Section 19.03—Offense of Receiving Stolen Government Property: "[W]ith knowledge that it has been stolen from the United States" (634).

Section 19.05—Requisite Intent (638):

"An essential element of the crime of theft of government property is the specific intent by defendant to defraud the United States by appropriating to his own use, or the use of another, property which he knew belonged to the United States. If the defendant did not have this specific intent he cannot be found guilty of this crime."

The Comments following these four recommended instructions rely for the ownership scienter requirement wholly upon *Morissette* and *Souza,* which, as we have seen, do not support that requirement. Thus, insofar as Sections 19.01, 19.02, 19.03 and 19.05 are contrary to the conclusions reached in this case, they are inoperative.

The instruction given and hereby approved in this case is substantially similar to that given and approved by the Ninth Circuit in Baker v. United States, 429 F.2d 1278 (9th Cir. 1970).

### IV

Defendant has raised two other contentions: The refusal of the trial court to instruct the jury on entrapment and the denial of defendant's motion to reassign the case to another judge.

Defendant, testifying on his own behalf, said that Juan Juarez "told me that he had a brother-in-law that dealt in drugs . . . and that he couldn't get anything, so I told him that I could . . ."; that Juan suggested "mostly milk sugar, probably a little stuff in it" and that defendant was "going to give him milk sugar" (Tr. 105, 107). When defendant ran off with the money, he had delivered neither heroin nor milk sugar. His own testimony revealed no reluctance whatever to agree to sell heroin or milk sugar with heroin or plain

milk sugar and he needed no inducement to engage in any of these possible crimes.

In United States v. Bradley, 426 F.2d 148, 150 (7th Cir. 1970), we held that the trial court did not err in failing to give an entrapment instruction, where

"The instant case discloses only the existence of bare requests—mere opportunities for Bradley to violate the law if he were so inclined, ready and willing and able to produce the requested narcotic. There is no evidence of persuasion, importuning, play on sympathy or other emotion, or other factor which would serve to clothe a mere request with the indicia of inducement."

In United States v. Russell, 411 U.S. 423, 435–436, 93 S.Ct. 1637, 1644, 36 L. Ed.2d 366 (1973), the Supreme Court said:

"*Sorrells* and *Sherman* both recognize 'that the fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution,' [Sorrells v. United States] 287 U.S., at 441 [53 S.Ct. at 212, 77 L.Ed. 413;] [Sherman v. United States] 356 U.S. at 372 [78 S.Ct. 819, at 820, 2 L.Ed. 2d 848]."

The trial judge did not err here in refusing to give an entrapment instruction.

 Defendant's last contention is based on the fact that Judge Austin convicted defendant on a bench trial, granted a new trial and then heard the second trial before a jury despite defendant's motion for reassignment to a different judge, citing Circuit Rule 23. Rule 23 applies only to reassignment for a new trial after remandment upon appeal. "We do not see how the exercise of . . . discretion in one trial, without more, could necessarily result in preju-

dice against an accused in a second trial." United States v. Bolden, 355 F. 2d 453, 456 (7th Cir. 1965).

The judgment for conviction is affirmed.[2]

Affirmed.

---

2. This opinion has been circulated among all judges of this court in regular active service and no judge has voted that the matter of adopting a position concerning which a conflict exists between the circuits or of modifying existing rules be reheard *en banc*.